UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

DAVID J. SANTANA,

                    Petitioner,

     v.                                       9:20-CV-1098
                                                     (TJM/ML)

EARL BELL, Superintendent

                    Respondent.

_____

APPEARANCES:                        OF COUNSEL:

DAVID J. SANTANA
Petitioner, pro se
15-B-1248
Shawangunk Correctional Facility
P.O. Box 700
Wallkill, NY 12589

HON. LETITIA JAMES                PRISCILLA I. STEWARD, ESQ.
Attorney for Respondent            Ass't Attorney General
New York State Attorney General - New York Office
28 Liberty Street
New York, New York 10005

MIROSLAV LOVRIC
United States Magistrate Judge

**REPORT-RECOMMENDATION and ORDER**

## I.   INTRODUCTION

      Petitioner David J. Santana ("Petitioner") seeks federal habeas corpus relief pursuant to 28 U.S.C. § 2254.  Dkt. No. 1, Petition ("Pet.").  Petitioner filed a motion for leave to proceed in forma pauperis ("IFP").  Dkt. No. 2, IFP Application.  On September 14, 2020, Petitioner's IFP application was denied as incomplete and this action was

administratively closed due to Petitioner's failure to properly commence it. Dkt. No. 3, Order Directing Administrative Closure. Petitioner was advised if he desired to pursue this action he must so notify the Court and, within thirty days of the Order, either (1) pay the filing fee of five dollars, or (2) submit a completed, signed, and properly certified in forma pauperis ("IFP") application. *Id.* at 2. Petitioner subsequently paid the filing fee and the case was reopened. Dkt. Entry dated 10/02/2020 (identifying receipt information for the filing fee transaction); Dkt. No. 5, Text Order (restoring action to the Court's active docket).

Respondent successfully requested permission to file a memorandum of law and certain records under seal. Dkt. No. 8, Letter Motion (requesting permission to file submissions under seal); Dkt. No. 9, Text Order (granting request). Respondent submitted a response. Dkt. No. 11, Response; Dkt. No. 12, Unsealed State Court Record ("USR"); Dkt. No. 15, State Court Record ("SR"); Dkt. No. 15-1, Respondent's Memorandum of Law; Dkt. No. 15-2, State Court Transcripts ("T"). Petitioner successfully requested an extension of time to file a reply. Dkt. No. 16, Letter Motion (requesting an extension of time); Dkt. No. 17, Text Order (granting request). Petitioner subsequently filed a reply. Dkt. No. 19, Traverse.

## II.    RELEVANT BACKGROUND

### A. Indictment

In an indictment dated October 2, 2014, Petitioner was charged with: Criminal Sexual Act in the Second Degree, in violation of New York PENAL LAW ("P.L.") § 130.45(1); Sexual Abuse in the Second Degree, in violation of P.L. § 130.60(2); and

Endangering the Welfare of a Child, in violation of P.L. § 260.10(1). SR 16-17. The Grand Jury found, on or about June 2, 2014, Petitioner:

> [B]eing eighteen years old or more, engaged in oral sexual conduct with a person less than fifteen years old[;] . . . subjected another person to sexual contact and [] such person was less than fourteen years old[; and] . . . knowingly acted in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old.

SR 16-17. On October 3, 2014, Petitioner appeared before Montgomery County Court ("trial court"), represented by Mr. Rockmacher, whom Petitioner had retained. T 1-5. Petitioner entered pleas of not guilty to the charged offenses. T 3-4.

### B. Jury Trial

Petitioner appeared before Montgomery County Court for a jury trial which commenced on February 2, 2015. *See generally*, T 12-528. The Honorable Felix J. Catena conducted a *Sandoval* hearing then ruled the People would not be allowed to reference Petitioner's 2008 conviction for Rape in the Third Degree, unless Petitioner testified, in which case the prosecutor would be allowed to ask whether Petitioner had a previous felony conviction and the date of that conviction. T 33.[1] A jury was selected, sworn in, and instructed then the parties delivered opening statements. T 36-260.

#### 1. The People's Case

##### i.    Shanice Santana

Shanice Santana testified she was born on December 14, 2000. T 263. The witness identified the Petitioner as her father, David Santana. T 264.

---

[1] *See generally*, *People v. Sandoval*, 34 N.Y.2d 371 (1974) (explaining the New York procedure under which the trial court determines whether evidence of prior convictions is admissible in the event that the defendant testifies).

Ms. Santana testified in the summer of 2014, she resided at 51 Knollwood in Amsterdam, New York.  T 265.  The witness recalled spending a day in early June swimming at her cousin– Deliana Figueroa's –house, accompanied by her mother, father, sister, and brothers.  T 265-66.  Ms. Santana testified she returned home around 11:00 that evening, then "went straight to bed."  T 266.  She also recalled her father had remarked "that it's really hot" and suggested Ms. Santana "take [her] shorts off" and sleep in "[j]ust [her] underwear[,]" but the witness declined to do so.  T 279-80.

The witness explained the bedroom she shared with her younger sister was located on the first floor of the home, while a second bedroom shared by her parents and a third bedroom belonging to her younger brother were located upstairs.  T 267-68.  Ms. Santana explained her bedroom contained a fish tank, which produced light at night, and an alarm clock, which was kept next to her bed.  T 269.  Ms. Santana stated the temperature was "really hot" on the night of June 1, 2014, so a fan located next to the bedroom window was turned on, however, Ms. Santana could not recall whether the window was left open.  T 271-72.

Ms. Santana testified that after she fell asleep, she woke up sometime around 2:00 or 3:00 a.m., because she "felt something in [her] butterfly[.]"  T 271-73.  Ms. Santana explained she felt "[a] finger" on "[t]he inside" of her "butterfly"– a term she used in place of vagina –and knew what time the contact occurred from looking at her alarm clock.  T 271-74.  Ms. Santana described seeing Petitioner "[i]n [her] room[,] next to [her] bed" and said the contact "hurt."  T 272-73.  She also explained she was able to identify her father as the person in her room because of the light from her fish tank.  T 271-72.  Ms. Santana testified the contact continued for approximately "[a] couple of

4

seconds[,]" but ended when she moved and Petitioner subsequently "walked away."  T 274.

Ms. Santana stated she "fell back asleep[,]" but woke up again when she felt "[s]omeone [sic] taking off [her] underwear and [her] shorts."  T 275-77.  The witness explained she saw Petitioner "was back again" and "kneeled" next to her bed.  T 275-76.  Ms. Santana testified she "felt like something [was] on [her] butterfly again" which felt "like something [sic] wet" or "a tongue in [her] butterfly" and heard "a slurping sound[.]"  T 276-77.  The witness recalled seeing Petitioner's "head" "right there" as it happened.  T 277-78.  Ms. Santana stated Petitioner remained there for "[a] couple minutes" until he left and she resumed sleeping.  T 278.

The next morning, Petitioner woke Ms. Santana up for school and asked why she "had [sic] shorts off or something."  T 278-79.  Ms. Santana explained that when she arrived at St. Mary's Institute, where she was a seventh grade student on June 2, 2014, she "couldn't believe what [sic] [had] happened [the previous] night" and "was scared."  T 280.  The witness stated she had been "quiet" because she was "nervous," which made her cousin, Figueroa, ask "what was wrong[.]"  T 281.  Ms. Santana explained she and Figueroa went to a school bathroom where she "told [Figueroa] what happened[.]"  T 281.  Ms. Santana recalled Figueroa "started crying with" her, but after the two left the bathroom, Ms. Santana "tried not to think about it because [she] had to worry about school[.]"  T 281-82.

At some point later in the school day on June 2, 2014, Ms. Santana had a conversation with another student named Autumn Rodriguez, during which Ms. Santana told Rodriguez what had happened the prior evening.  T 282.  Ms. Santana also asked a

third student, Talia Peconie, if she could stay at Peconie's house, because Ms. Santana wanted to "run away." T 282-83. Peconie agreed to ask her mother if Ms. Santana could stay with them after Ms. Santana disclosed what had happened. T 283. Ms. Santana recalled "panicking" because she "didn't know what to do . . . because [she] still was going home" where she would see Petitioner. T 283.

After additional conversations that evening and the following school day, Rodriguez "convinced [Ms. Santana] to tell the [school] nurse" what had happened "because [Rodriguez] said it would make it all better." T 283. Ms. Santana testified Rodriguez accompanied her to the nurse's office, where "[Rodriguez] told [the school nurse] what happened." T 284. Ms. Santana explained she had conversations with detectives both at school and the police station. T 284-85.

On cross-examination, defense counsel first asked Ms. Santana about the layout of the residence at 51 Knollwood. T 285-86. Ms. Santana stated her bedroom was located next to the bathroom, but she could not hear someone using the bathroom from her bedroom, and did not know whether her mother and father had used the bathroom while she was sleeping on June 1-2, 2014. T 286. Ms. Santana also described her alarm clock as a small square, which produced light less bright than that produced by a night light, and her fish tank as a small square with a motorized filter, which produced light brighter than that produced by a night light. T 287-88. She further testified she did not ever turn the fish tank light off to sleep and left the light on all of the time. T 288.

Turning to the bedroom fan, Ms. Santana explained the fan could fit in the window, but she did not remember it being placed in the window the night of June 1, 2014. T 289. Ms. Santana also testified she did not remember whether the window had

been left open when she went to bed that evening, but did not have any preference as to whether the window was left open or shut overnight.  T 289-90.  Ms. Santana agreed she was happy and had a good time swimming at her cousin's house on June 1, and did not recall having an argument with her father at any point in the day.  T 290.  Ms. Santana testified she did not remember whether a hall light was left on after she went to bed, but confirmed she typically kept her bedroom door partially opened.  T 291.

Defense counsel asked Ms. Santana about school and the witness explained her "behavior was good in school" but agreed her grades were low, which made her parents unhappy.  T 292-93.  Ms. Santana testified she tried to work to improve her grades.  T 293.  Defense counsel asked Ms. Santana if she ever told her mother what happened to her and Ms. Santana stated she did not.  T 293.  The witness explained she thought her mother would believe her, but stated she did not have a close relationship with her mother.  T 293.

Next, defense counsel asked Ms. Santana about her older brother, Jesus.  T 294.  Ms. Santana testified Jesus had previously resided with her at 51 Knollwood and had a bedroom in the basement.  T 294.  However, Ms. Santana explained Jesus had "moved out [sic] a couple of weeks before" the June, 2014, incident.  T 294.  Ms. Santana did not remember Jesus having left any items in the basement room, but agreed it was possible.  T 295.  Finally, defense counsel asked Ms. Santana whether she had been taken to St. Mary's Hospital.  T 295.  The witness testified she met with a doctor or nurse and underwent a physical examination, but did not know about the examiner's findings.  T 295.

On re-direct examination, Ms. Santana testified she "[s]ometimes" had arguments with her parents and recalled being disciplined by her father for her "behavior" and "hav[ing] a really bad attitude."  T 296.  Ms. Santana stated she was "grounded" for "a couple of days" for using the website "Instagram" on her cell phone, but recalled this occurred "way before" June 1, 2014.  T 296-98.  Finally, Ms. Santana confirmed she had been disciplined for bad grades.  T 298.

### ii.    Joan Santana

Joan Santana testified she had three children– Shanice, Oshianna, and Jose – with her spouse, the Petitioner.  T 300-01.  Ms. Santana testified she had been married to Petitioner for fourteen years at the time of his trial and explained Petitioner had two other children, Mayella and Jesus.  T 301.

The witness stated she, Petitioner, Shanice, Oshiana, and Jose resided at 51 Knollwood in June of 2014.  T 302.  Ms. Santana confirmed she and Petitioner shared one bedroom upstairs, her son used another, and Shanice and Oshiana used the downstairs bedroom.  T 303.  Ms. Santana testified her daughters' bedroom contained a bunk bed, dressers, a desk, and a fish tank.  T 304.  The witness described the fish tank as "[s]mall" and testified she did not remember whether the tank had a light.  T 304.

Ms. Santana testified she, Petitioner, and their three children left Petitioner's sister's house to return home together on June 1.  T 305.  Ms. Santana estimated everyone was ready to go to bed by 9:00 or 10:00 p.m. that evening.  T 307.  Ms. Santana testified she and Petitioner took a shower in the bathroom– located on the first floor of the residence –that evening, then she went upstairs while Petitioner remained downstairs.  T 307-08.  The witness testified she later returned downstairs, where she

observed Petitioner removing a fan from the window of her daughters' bedroom around 10:00 or 11:00 p.m., then she and Petitioner went upstairs together.  T 308.

Ms. Santana explained she suffered from chronic pain in her lower back, which was "horrible" the night of June 1, 2014, therefore, she asked Petitioner to retrieve medication from the first floor "[a] couple hours" later.  T 309-10.  Ms. Santana recalled Petitioner retrieved a cream and applied it to her back, then she fell asleep.  T 310.  The witness stated she woke up before the morning because of her back pain and saw Petitioner "right next to [her]."  T 310.

The witness explained she usually remained upstairs in the morning while Petitioner woke up the children, and he did so on June 2, 2014.  T 311.  Ms. Santana testified she was at work on June 4, 2014, when she was contacted by the police.  T 311-12.  Ms. Santana stated she did not see or speak to Petitioner the afternoon of June 4, 2014, either at the police station or over the phone.  T 312-13.

On cross-examination, Ms. Santana testified she could not remember who woke up the children and prepared them for school on June 2, 2014, but thought she may have done so, because she had two days off of work.  T 314.  Defense counsel asked the witness whether she knew "if Shanice was acting in any different way than she might normally act" and Ms. Santana answered "[n]o" and agreed that Shanice "seemed okay[.]"  T 314.  The witness described her relationship with Shanice as "[v]ery hard[,]" perhaps because Shanice was a teenager or the witness was "always working."  T 315.

Ms. Santana stated Shanice did not behave at home, because Shanice was "[m]outhing off, [and] disrespectful . . . [a]ll the time[.]"  T 315.  Defense counsel asked for "an example of what disrespectful actions Shanice would show" and Ms. Santana

stated Shanice was "[j]ust disrespectful[.]"  T 315.  Petitioner's attorney asked if Shanice

was "ever disrespectful toward[s] her dad" and the witness answered Shanice was

"[j]ust mouthy[.]"  T 315.  Counsel asked if "Shanice [was] disrespectful to [her sister,]

Oshianna" and Ms. Santana said "[a]ll the time[,]" because Shanice "wants to be the

mom" as Ms. Santana "work[ed] a lot."  T 316.  Defense counsel asked if Shanice was

disrespectful to her father again and Ms. Santana answered, "[s]he tries. She gets

mouthy, but he puts her in her place."  T 316.

Petitioner's attorney asked Ms. Santana if she had ever received a report from a

teacher about Shanice's behavior in school, and the witness answered "[s]he's doing

[sic] stuff at days off, or she's not paying attention or taking some stuff and putting on

her glasses and, [sic], they yell at her, and . . . when she got into middle school she was

mouthing off, [sic] to the teachers and cutting class[.]"  T 317.  Defense counsel asked

Ms. Santana if she would ever "ask Shanice a question and get an answer that wasn't

quite the truth" and Ms. Santana stated Shanice "would lie to [her] all time" and Ms.

Santana "d[id]n't know what to believe[.]"  T 317.

On re-direct examination, the prosecutor asked about Ms. Santana's relationship

with Shanice "since June of [2014]" which the witness described as "[r]ough[.]"  T 318.

The prosecutor asked if Shanice helped by watching and feeding her younger brother

and sister while Ms. Santana worked and Ms. Santana testified "my 11 year old

[daughter] does a lot more than what [Shanice] does" but "[Shanice]'s in charge

because she's older[.]"  T 319.  The prosecutor also asked Ms. Santana about her

relationship with her husband, and Ms. Santana testified she loved her husband and

spoke to him "all the time."  T 319-20.  Ms. Santana also stated she had spoken to her

husband about his case.  T 320.

### iii.    Deliana Figueroa

Deliana Figueroa testified she had known her cousin, Shanice Santana, for "[her]

whole life."  T 323-25.  The witness identified Petitioner as her uncle, the brother of

Figueroa's mother.  T 324.  Figueroa testified she attended St. Mary's Institute with her

cousin Shanice during the 2013-2014 school year.  T 325.

Figueroa described her cousin's demeanor on June 1, 2014, as "fine[,]"

explaining "[s]he was acting herself" as the family swam.  T 326.  The witness recalled

her aunt, uncle, and cousins left "[l]ate at night[.]"  T 327.  Figueroa testified when she

saw Shanice at school the following morning "she wasn't acting herself."  T 327.  The

witness explained Ms. Santana was not loud or outgoing, which was unusual.  T 327-

28.  Figueroa asked Ms. Santana what was wrong during breakfast in the cafeteria, but

Ms. Santana "told [Figueroa] nothing[.]"  T 327-28.

The witness stated she continued to attempt to talk to Ms. Santana, but Ms.

Santana declined to converse, and the two eventually reported to home room.  T 328-

29.  Ms. Figueroa testified that during homeroom, she and Shanice went to the

bathroom, where Ms. Santana "t[old Figueroa] that her dad had molested her[.]"  T 329.[2]

Figueroa stated she hugged her cousin and stayed with her in the bathroom for a

couple more minutes until the bell rang.  T 330-31.

---

[2] Following Ms. Figueroa's answer, County Court instructed the jury that the testimony had been "allowed
. . . for a limited purpose. It was admitted only to show that a complaint was made, not for the truth of
what was said."  T 329-30.

Defense counsel cross-examined Figueroa and the witness explained she had seen Shanice not act like herself on other occasions prior to June 2, 2014.  T 334. Petitioner's attorney asked the witness "how [Shanice] got along with her mom" and Figueroa answered "[s]ometimes they bump heads, but who doesn't[.]"  T 335. Figueroa agreed Shanice had acted unlike herself on prior occasions because of problems with her mother.  T 335.

### iv.    Autumn Rodriguez

Autumn Rodriguez testified she was a seventh grade student at St. Mary's Institute in June of 2014.  T 338.  The witness testified she had met Shanice Santana at the beginning of the school year, and the two had become close friends.  T 338-39.

Rodriguez told the jury on the first Monday in June of 2014, during lunch, Ms. Santana "said that her dad came in her room and he molested her and touched her down there[.]"  T 339-40.[3]  The witness testified she and Ms. Santana did not discuss the subject further that day.  T 340.  Rodriguez recalled she discussed the matter again the following day with Ms. Santana and another student, Talia Peconie.  T 340-41.  The witness testified she instructed Ms. Santana to "tell someone[,]" such as the school nurse, but Ms. Santana "was too scared."  T 341.

Eventually, Rodriguez and Peconie accompanied Ms. Santana to the nurse's office.  T 341.  The witness explained Ms. Santana "was too scared to tell the nurse anything, so [Rodriguez] had to tell the nurse," then the nurse instructed Rodriguez and Peconie to go back upstairs.  T 341.  Rodriguez stated she left Ms. Santana with the school nurse, and Ms. Santana did not return to St. Mary's Institute the following school

---

[3] Montgomery County Court instructed the jury this testimony was "[n]ot [allowed] for the truth of what was said, but only as it may bear upon the credibility of the alleged victim[.]"  T 340.

year.  T 341-42.  Petitioner's attorney declined to conduct a cross-examination of Rodriguez.  T 342.

### v.    Talia Peconie

Talia Peconie testified she attended St. Mary's Institute as a seventh grade student from 2013 to 2014. T 344. The witness confirmed Shanice Santana and Autumn Rodriguez were also students at St. Mary's Institute at the time.  T 344.

Peconie testified that during the first week of June in 2014, Santana wrote her a note wherein Ms. Santana requested to stay at Peconie's house but instructed Peconie "not to ask why, [because Ms. Santana] d[id]n't want to tell [Peconie] yet."  T 345.  The witness explained she was not able to write a note back to Ms. Santana, so she asked Rodriguez "what was going on."  T 345.  Peconie testified Ms. Santana later disclosed to her that Ms. Santana's "father did something to her, he touched her and stuff like that in bad ways."  T 346.[4]  The witness recalled at the end of the day, she had a conversation with Rodriguez and Ms. Santana over the phone, during which Ms. Santana "said she can't leave because her mom won't let her out of the house . . . [because] she was grounded or something like that."  T 346-47.

The next day, Peconie had another conversation with Ms. Santana and Rodriguez during lunch, and the two instructed Ms. Santana to disclose what had happened.  T 347.  The witness explained Ms. Santana was "nervous about saying something" because "she didn't want people not to believe her, and she didn't . . . want to be poor and stuff like that."  T 347.  Peconie testified that when lunch ended, she and Rodriguez walked with Ms. Santana to the nurse's office.  T 348.  The witness recalled

---

[4] County Court instructed the jury "again, same instruction on how you can interpret this testimony."  T 346.

"nurse Sherri . . . asked [Rodriguez] or [the witness] to say anything, and [Rodriguez]

said something." T 348. After Rodriguez said something to the nurse, Peconie recalled

the nurse "had Shanice sit down and wait for the principal to come to the office, and

then the principal told [Peconie] and [Rodriguez] to leave." T 348.

On cross-examination, Petitioner's attorney asked Peconie about the note from

Ms. Santana. T 349. Peconie testified she "gave it to Sarah[,]" apparently referring to

the assistant district attorney. T 349. Defense counsel asked Peconie what led her to

believe something was wrong with Ms. Santana, and the witness explained Ms.

Santana "seemed scared" when she handed the note to Peconie. T 350. The witness

further explained she knew to consult Rodriguez about her concerns with Ms. Santana

because she had seen the two talking earlier. T 350. On re-direct examination,

Peconie clarified she kept the note from Ms. Santana in a notebook until Peconie's

mother spoke to someone, who the witness believed was the prosecutor. T 351.

### vi. Sherri Kruger

Sherri Kruger testified she was employed as the school nurse at St. Mary's

Institute. T 352-53. Kruger explained she met a student named Shanice Santana in her

capacity as the nurse in 2014. T 353. Kruger described Ms. Santana's behavior at

school as "[v]ery kind," and "happy." T 354. The prosecutor asked if Ms. Santana was

"a student that often was in trouble" and Kruger answered "[n]o." T 354.

Kruger recalled that on June 4, 2014, Talia Peconie and Autumn Rodriguez

brought Ms. Santana into her office. T 354-55. The witness explained that after she

learned what had happened, she asked the other two students to leave and had a

conversation with Ms. Santana alone. T 355-56. Kruger testified she waited with Ms.

14

Santana until two officers arrived approximately a half-hour later.  T 356-57.  Petitioner's

attorney declined to cross-examine Kruger.  T 357.

### vii.    Amanda Spaulding

Amanda Spaulding testified she worked as a detective in the Amsterdam Police

Department and was assigned an investigation at St. Mary's Institute on June 4, 2014,

in that capacity.  T 359-60.  Because the investigation commenced with receipt of a

"CPS hotline report[,]" Spaulding testified she contacted Shelby Louis, the CPS worker

on call at the time. T 360.  Detective Spaulding testified she met with Louis and

Detective Pasquarelli at St. Mary's School, where the three were directed to the nurse's

office. T 360-61. The witness testified she had a conversation with Shanice Santana in

the nurse's office, which lasted approximately fifteen to twenty minutes, then brought

Ms. Santana to the Amsterdam Police station. T 361. The detective explained she

contacted Ms. Santana's mother, then spoke with Shanice Santana in an interview room

for almost two hours. T 361-62.

Detective Spaulding testified she and Detective Pasquarelli conducted an

interview of Petitioner in a detective bureau interview room.  T 362.  The witness

explained the interview room was equipped with recording equipment, which was used

to record Petitioner's interview, and identified an exhibit as a disk containing a copy of

the interview.  T 363-64.  The prosecutor played a portion of the video for the jury

pursuant to stipulation.  T 364-66.  The witness identified herself, Detective Pasquarelli,

and the Petitioner in the video footage and clarified she did not conduct any additional

interview of Petitioner other than that which was depicted in the exhibit.  T 366-67.

Petitioner's attorney asked the witness to explain how she elicited information from Ms. Santana, and Spaulding explained the process. T 368. Defense counsel asked whether a series of facts could become ingrained in a child's mind such that the child would feel obligated to repeat that version of the facts during later recollections and Spaulding answered:

> In [her] experience[,] when someone's telling the truth there's no question. You can tell the truth once or 100 times, and usually if you're lying there's inconsistencies, and when [the witness] was speaking with Shanice [Santana,] there w[ere] no inconsistencies . . . she told the same story each time. Each question the answer was the same.

T 369-70. Detective Spaulding testified she completed specialized forensic interview training to learn how to work with children and explained the protocol followed in investigations such as the interview of Ms. Santana. T 370-71.

Spaulding testified she further investigated Shanice Santana's claims by speaking to both of her parents. T 371. The detective also confirmed she was not wearing a firearm when she interviewed Ms. Santana. T 372. Defense counsel asked if Ms. Santana used dolls or made drawings to explain what had happened to her and Ms. Spaulding stated Ms. Santana made a drawing. T 373.

Finally, defense counsel asked the detective if she gathered "any physical evidence such as medical records[.]" T 374. Detective Spaulding explained she did not take Ms. Santana to a doctor or collect any physical evidence, but had recommended seeking therapy. T 374-75. Petitioner's attorney asked whether the detective recommended Ms. Santana consult with "a medical doctor for testing" for "[p]enetration, rape, [or] anything to that affect" and Spaulding explained she "did not because . . . the allegation wasn't that her dad had had sex with her using his penis. She had said that it

16

was oral contact and him using . . . his fingers" and "a rape kit" would be used in situations involving allegations of "penis to vagina penetration." T 375. On re-direct examination, Detective Spaulding confirmed the Amsterdam Police Department would not refer a victim for a rape examination "unless there [was] penis to vagina contact[.]" T 376.

### viii.    Stephen Pasquarelli

Stephen Pasquarelli testified he worked as a detective in the Amsterdam Police Department and responded with his partner, Detective Spaulding, to a report at St. Mary's Institute on June 4, 2014, in that capacity. T 377-78. When they returned to the police department, Detective Pasquarelli testified he was instructed to locate Petitioner. T 379-80. The detective explained he found Petitioner in the driveway of his residence, requested to speak to him, and drove Petitioner to the police department. T 380. Pasquarelli stated he participated in the interview of Petitioner and at the conclusion of the interview, Petitioner asked to smoke a cigarette and a supervisor allowed Pasquarelli to bring Petitioner to the "sally port"– a secured garage bay area –to smoke. T 380-81.

Detective Pasquarelli explained he, Detective Sergeant Cole, and Detective Pratt remained in the sally port with Petitioner as he smoked the cigarette. T 381. The witness explained they had conversations with Petitioner about his military service while Petitioner smoked the cigarettes, until it became quiet, then Petitioner "took out his wallet and looked at a picture of his daughter, Shanice[.]" T 381. As Petitioner looked at the photograph, Pasquarelli recalled he "just simply asked why[?], and [Petitioner]

was crying, and he said, 'I don't know why,' and he was questioning himself . . . 'Why would I do this to my daughter[?].'"  T 382.

The witness explained the detectives brought Petitioner back inside of the building "[s]hortly after that . . .[then] placed [Petitioner] on the rail," and allowed him to make a phone call.  T 383.  Pasquarelli testified Petitioner requested to call his wife, so an officer dialed her phone number, and the witness remained in the room for the call.  T 383-84.  The detective further explained all of the phone calls made from the booking rail were recorded and identified an exhibit as a CD containing a copy of the phone call.  T 384.  The prosecutor entered the exhibit into evidence and played the recording for the jury.  T 385.  Detective Pasquarelli identified one voice as belonging to Petitioner and the other as belonging to Petitioner's wife.  T 385-86.

On cross-examination, defense counsel asked the detective whether Petitioner was aware his interview was being recorded, but Pasquarelli did not know.  T 386.  Pasquarelli explained there were no recording devices in the sally port area, but "two giant cameras" at the rail where Petitioner made the phone call to his wife.  T 387.  Defense counsel asked about Petitioner's question "'[w]hy would I do this to my daughter[?],'" and the witness explained he understood Petitioner to be questioning himself, rather than asking one of the detectives.  T 388.  Finally, Pasquarelli confirmed Petitioner did not ever state "'I did this to my daughter[.]'"  T 388.

### 2.  The Defense Case

After the People rested their case, defense counsel called Petitioner to testify on his own behalf.  T 391-94.  Petitioner testified he was born on July 16, 1975, and resided at 51 Knollwood Ave. on June 1, 2014.  T 395.  Petitioner testified he typically

worked from 7:00 a.m. to 4:00 p.m. and his wife typically worked from 11:00 a.m. to 7:00 or 8:00 p.m. T 395-96. Petitioner explained his routine after returning home from work, testifying he would "check [on] the baby, check the kids, do their homework, start cooking, [and] indicate [to his] children after they [were] done doing their homework to do the chores[.]" T 397. Defense counsel asked who prepared the children for bed at night and Petitioner answered "[t]hey w[ould]. They all conduct themselves to take a shower, prepare their clothes for school [the] next day, and if they finish[ed] all of their assignments[,] they can then watch TV and relax." T 397. Petitioner also described a typical morning, stating he would wake up at 5:30 a.m., "get ready for work . . . [and] wake up the girls at a certain time around 6:00, 6:20 so they can get ready for the bus." T 397-98.

Petitioner testified he brought his children to his sister's home to go swimming around 1:00 or 2:00 p.m. on June 1, 2014, and stayed there until about 9:00 p.m. T 398-99. When the family arrived at their house, Petitioner stated his "wife took care of tucking everybody in, getting ready for bed and shower[ing] and making sure that the clothes were ready and everything" while he "decided that [he] needed to work on the computer in his daughter's room to put the program for her typing classes and the math classes for Oshianna[.]" T 399-400. Petitioner explained he began to work with the computer earlier in the day, but because of the hot temperature, he decided to take the children to his sister's home instead. T 400.

Petitioner described the layout of his daughters' room, which included a bunk bed, computer desk, nightstand, dresser, mirror, fish tank, book stand, and alarm clock. T 400-01. Petitioner described the alarm clock as containing "a little blue neon light"

and the fish tank as a small "neon light fish tank[.]"  T 401.  Petitioner stated the room had one window, one closet, and was "[v]ery hot" when the family returned from his sister's house on June 1, 2014.  T 401-02.  To keep the house cool, Petitioner explained he "opened the screen door from the kitchen[,] . . . turned the air conditioner on, and [he] put a fan in [his] daughters' room."  T 402.  Petitioner testified he placed the fan in the bedroom window so it would blow air towards the bunk bed.  T 402-03.

Petitioner stated he did not know what time Oshianna and Shanice went to sleep, but recalled he and his wife took a shower after his daughters went to sleep.  T 403. Petitioner explained his wife had suffered from hip and back pain and would take prescription medication and apply "Icy Hot" lotion to alleviate the pain.  T 403-04. Petitioner testified he gave his wife a massage and applied the skin cream the night of June 1, 2014.  T 404-05.

Petitioner testified that after he got out of the shower, he decided to remove the fan from the window of his daughters' room.  T 405-06.  Petitioner explained he "struggle[d]" to close the window after removing the fan because of temporary caulking used to seal the windows during the winter.  T 405-06.  He further explained he had removed the fan in this manner on previous occasions to ensure the first floor bedroom was secure.  T 406.  Petitioner estimated he remained in the bedroom for "[j]ust a minute," but his wife entered the room and asked Petitioner what he was doing in a normal volume voice, and Petitioner responded he was "'fighting with the window.'"  T 407-08.  After removing the fan and closing the window, Petitioner and his wife exited their daughters' bedroom, leaving the door "not closed completely[.]"  T 408.

Defense counsel asked about lighting in the bedroom that night and Petitioner explained there was no light in the hallway, and the room was dark because Petitioner shut off the fish tank lights "[e]very night" and had turned off the alarm clock when he had connected the computer earlier that evening.  T 408-09.  Petitioner testified "[t]he only light you can get in that room is a light pole that is outside on the street[,]" and added the window was covered by curtains.  T 409.  After exiting his daughters' bedroom, Petitioner testified he "proceeded to go upstairs with [his] wife" but did not go to sleep because his "wife [was] complaining about her back again[;]" therefore, Petitioner "went downstairs and grabbed the cream and proceeded to go back upstairs to give her a massage."  T 409-10.

Petitioner stated he "laid next to [his wife]" then, "[a]fter [his] wife was settled down and relaxed[, Petitioner] took the lotion and the pill and the cup back downstairs." T 411.  While downstairs, as Petitioner "was going towards the bathroom[, he] heard something in his daughters['] room[,]" which sounded "[l]ike a little mumble[,]" therefore, Petitioner "jarred the door a little bit more[ and] peaked [his] head in" then took "two steps to the bunk [bed] to look [at] Oshianna" and then "proceeded next to Shanice's bed, but . . . ha[d] to duck down," to access the lower bed and "proceeded to go very slow in her ear and said, '[a]re you okay, baby?[.]'"  T 411.  Petitioner testified "[s]he did like a little moan" in response, but it "sounded like she was okay."  T 412.  Defense counsel asked how long Petitioner was in the room and Petitioner answered less than thirty seconds.  T 412.

Next, Petitioner testified "[a]fter [he] left Shanice mumbled. [Petitioner] was walking out of the door. [Petitioner] saw the sheets on the floor, and [he] grabbed it and

[he] threw it over her" then "left the room" to return "[u]pstairs to [his] wife." T 412. When he returned upstairs, Petitioner recalled he asked his wife if she was okay, she said "[i]t hurts[,]" and Petitioner instructed her to "try to relax and let the medication work[.]" T 412. Petitioner testified he went to sleep "[e]ventually[.]" T 412.

Petitioner recalled waking up around 5:30 a.m. on June 2, 2014, and following his normal morning routine before going to work. T 413. Petitioner testified he was working on his boat at home around 3:00 on June 4, 2014, when he was met by members of the Amsterdam Police Department. T 413. Defense counsel asked about Ms. Santana's performance in school and Petitioner stated she was "[l]ike every typical teenager. She was struggling with the changes not only of the house but of going to middle school" and explained he "had to change her from schools" because "[s]he was cutting classes, getting in trouble and hanging out . . . with the wrong crowd." T 413-14. Petitioner told the jury he "and [his] wife had to do a drastic change" and used their "income to put her in St. Mary's Institute." T 414.

Defense counsel asked Petitioner to describe his daughter Shanice at home and Petitioner explained he was "a father of six kids" and "Shanice [wa]s more work than [Petitioner's] other kids . . . she was a little difficult." T 414-15. When asked to specify, Petitioner answered "[a]ggression, disrespect" and described Shanice as "[a]busive." T 415. Petitioner testified Shanice was abusive "[w]ith her sister" explaining "typical brothers and sisters fight all the time, but she took it a level higher than normal, so [Petitioner] had to be on her case about it." T 415. Petitioner stated Shanice "would pull Oshianna's hair or hit her or call her bad names . . . [outside of her parents] presence[.]" T 415-16. In these situations, Petitioner stated he would "[t]ry to have a

conversation with [his] daughter, try to make her understand that she's not the mother in the house of [Petitioner's] other child" because "[e]ven though she [would] take[] care of them once in a while[, that] di[d]n't mean she's the mother."  T 416.  Petitioner also described Shanice's relationship with her mother as "edgy" because "[t]hey both have the same character[.]"  T 416.

Defense counsel inquired about Shanice's character and Petitioner stated he "was brought up" with the belief "that you don't talk back to an adult, you don't argue with an adult, you don't get in people's conversation's when adults are speaking," but Petitioner's wife "was brought up differently," and "Shanice was drawn more towards being that way[.]"  T 416.  Petitioner described himself as the "disciplinarian" in his household, defense counsel asked if Shanice was ever unhappy with Petitioner's discipline, and Petitioner responded, "I bet she was."  T 417.

Petitioner testified nothing unusual happened between him and Shanice the day the family went swimming at Petitioner's sister's house.  T 417.  However, "[t]he day before the police officers came to [his] house[,]" Petitioner recalled he, Shanice, and his wife "had a very strong argument."  T 417.  Petitioner stated the argument began after he received a "poor" progress report from St. Mary's Institute and he and his wife "approached Shanice and told her that if she don't pass this year she will not have a summer, she will be punished."  T 417-18.

Petitioner testified Shanice's reaction to the conversation was "[n]ot good at all . . . She did her little tantrum that she's trying hard, and [Petitioner] told her it's not about trying hard, it's about getting results[.]"  T 418.  After dinner, Petitioner recalled "[t]here was a situation in the mall" which "was not normal."  T 419.  Petitioner testified he had

an argument with Shanice because she "wanted [Petitioner] to buy her stuff," but he could not because he had to buy a dress for Oshianna's graduation.  T 419.  Petitioner further explained "I don't like the mall[.] I told my wife we needed to go. My wife proceeded to tell me wait, and I had to scream a little. I put my voice up, '[n]o. We [are] leaving now.'"  T 420.  Petitioner stated he apologized to his wife on the car ride home. T 420.

The prosecutor began cross-examination by asking Petitioner about the video footage from the Amsterdam Police Department interview.  T 420.  Petitioner confirmed the interview occurred approximately three days after the alleged incident occurred.  T 421.  Petitioner also confirmed Detective Spaulding asked him why Shanice would lie, and Petitioner's response during the interview was "'I don't know why my daughter would lie. She's my daughter.'"  T 421.  Petitioner stated he heard his daughter Shanice's testimony and she lied.  T 421.

Petitioner stated he could not "come up with a reason why [his] daughter would lie" at the time of the interview because "[he] was in shock[.]"  T 421.  Petitioner agreed Detective Spaulding told Petitioner that Shanice reportedly saw the time on her alarm clock when Petitioner entered her room, but Petitioner did not tell Detective Spaulding that he had unplugged the clock.  T 422.  Petitioner further admitted he did not tell the detective he had shut off the fish tank light.  T 422.

Petitioner confirmed detectives asked him what he was doing in his daughters' room at 3:00 a.m.,  and he told the detectives he was "'[t]aking out the fan.'"  T 423. Petitioner agreed his statement in the interview was inconsistent with the testimony he and his wife gave at trial.  T 423.  Petitioner confirmed Detective Spaulding asked him

"on that tape about being in the room the second time" and Petitioner told Detective Spaulding he did not remember why he had been in the room a second time.  T 423-24. Petitioner asserted his recollection at trial, eight months later, was correct.  T 424.

Petitioner admitted he did not mention hearing a noise in his daughters' room during the interview.  T 425.  Rather, during the interview, Petitioner stated he entered the room to check on his daughter.  T 425.  Petitioner confirmed Shanice could walk and talk, and testified that, if she were feeling ill in the middle of the night, "[s]he would scream."  T 425.  When asked whether he really needed to check on his daughter, Petitioner stated "[t]hat's my job . . . I'm the father . . . I'm the securer. I'm not there to hurt them but to make sure that they're secure."  T 425-26.  Petitioner agreed he had said in the interview that he entered his daughters' room twice, and that he "kneeled down" next to Shanice's bed.  T 428.

The prosecutor asked about Shanice's behavior, and Petitioner confirmed Shanice was argumentative, had hit her sister, received bad grades, and cut class.  T 429.  The prosecutor asked whether Shanice had cut class at St. Mary's and Petitioner answered "[n]o, but she [was] . . . failing five classes."  T 429.  Turning to Petitioner's fight with Shanice, Petitioner confirmed he had not told the police about the fight during the interview, nor did he discuss the fight with his wife during his phone call to her at the police station.  T 430.

Petitioner testified his niece, Figueroa, was not a liar, to his knowledge.  T 432-33. Petitioner confirmed Figueroa had testified Ms. Santana disclosed what Petitioner had done to her on Monday, and Petitioner's fight with his daughter did not occur until

Tuesday evening.  T 434.  The prosecutor returned to the subject of Shanice's behavior,

asking the following questions as Petitioner provided the following responses:

> [Prosecutor]:  Now, David, going back to the things that you
> talked about with Shanice in terms of
> problems, she[ was] hanging out with the
> wrong crowd?
> [Petitioner]:   Yes.
> [Prosecutor]: Cutting class?
> [Petitioner]:   Yup.
> [Prosecutor]: She is calling her sister bad names?
> [Petitioner]:   Yes, Ma'am.
> [Prosecutor]: Pulling her hair?
> [Petitioner]:   Yes, Ma'am.
> [Prosecutor]: You didn't say liar, did you?
> [Petitioner]:   No. No, Ma'am. I [sic] s[aw] it.
> [Prosecutor]: You didn't say that Shanice [sic] one of the
> problems you had with Shanice was that she
> was a liar?
> [Petitioner]:   I had that problem with her many times.
> [Prosecutor]: I'm asking you in your testimony now did you
> say that?
> [Petitioner]:   No, not in my testimony.
> [Prosecutor]: Did you say that on the [interview] tape?
> [Petitioner]:   Not on the tape.

T 443-35.  Finally, Petitioner confirmed he was convicted of a felony in 2008.  T 435.

On re-direct examination, defense counsel asked Petitioner why he was hesitant

to answer some of the detective's questions and Petitioner explained:

> I had my school, my job, the closing of the house, the problem
> with Shanice, [s]ummer coming. I had so much on my mind,
> and then this happened. My mind just shut down. I couldn't. I
> had to sit back and think about all this, and it took me time.

T 435.  On re-cross examination, Petitioner admitted he did not hesitate to answer some

of the detectives' questions on the interview tape, testifying he remembered "[t]he basic

questions" but did not remember why he was in the room a second time.  T 437.

Following the People's re-cross examination of Petitioner the defense rested their case.

### 3. Summations, Deliberations, and Verdict

The People declined to call any rebuttal witnesses; therefore, Montgomery County Court excused the jury. T 438-39. Defense counsel argued the People had not met their burden of proof. T 440.[5] The prosecutor opposed Petitioner's motion to dismiss the charges and Montgomery County Court denied the motion. T 440-41.

Petitioner's attorney delivered the defense summation, the prosecutor made the People's summation, and Montgomery County Court instructed the jury on the law. T 449-90. The jury ultimately found Petitioner guilty as to all three counts. T 524-25.

### C. Sentencing

On March 27, 2015, Petitioner appeared before Montgomery County Court for Sentencing. *See* T 529-56, Sentencing Transcript. Joan Santana made a statement and provided County Court a letter purportedly documenting a clinic's evaluation of Shanice Santana. T 531-34. Thereafter, the prosecutor asked County Court to impose the maximum sentence of fifteen years' incarceration. T 535-37.

Petitioner stipulated to his status as a Second Child Sexual Assault Felony Offender as defined by P.L. § 70.07. T 539-41.[6] Petitioner also made a statement, wherein he "apologize[d] to the Court, [and Petitioner's] family and friends[.]" T 541-43. Defense counsel made a statement during which he emphasized Petitioner's low risk for recidivism. T 544-45. Petitioner spoke again and asked County Court to have mercy for his family. T 545-46.

---

[5] Petitioner acknowledged such a motion is typically made at the end of the People's case and County Court clarified it had previously indicated to the parties that all motions were to be reserved. T 439-40.
[6] *See also* P.L. § 70.07(2) ("A 'sexual assault against a child' means a felony offense . . . (a) the essential elements of which include the commission or attempted commission of sexual conduct . . . (b) committed or attempted to be committed against a child less than fifteen years old."); SR 45, Predicate Felony Conviction Statement.

For Petitioner's conviction of Criminal Sexual Act in the Second Degree, Montgomery County Court sentenced Petitioner as a Second Child Sexual Assault Felony Offender to a determinate term of ten years' incarceration, to be followed by ten years of post-release supervision.  T 549.  County Court also sentenced Petitioner to one year terms in the Montgomery County Jail for Petitioner's convictions on Sexual Abuse in the Second Degree and Endangering the Welfare of a Child.  T 549-50.

### D. Post-Conviction Motion

On May 23, 2017, Petitioner filed a pro se Motion to Vacate pursuant to N.Y. CRIMINAL PROCEDURE LAW ("C.P.L.") § 440.10.  *See* SR 54-55, Notice of Motion, 56-63, Affidavit in Support of Motion, 64-139, Memorandum of Law and Exhibits in Support of Motion.  Petitioner argued he was deprived of the effective assistance of counsel based on counsel's failure to seek reconsideration of County Court's decision denying Petitioner's motion to dismiss the indictment and "fail[ure] to present *Brady* material that [Petitioner] was actually innocent[.]"  SR 59-63.  The People opposed Petitioner's motion.  *See* SR 140-41, The People's Answering Affirmation.

On June 26, 2017, Montgomery County Court denied Petitioner's motion.  *See* USR 3-5.  County Court reasoned the record contained sufficient facts to permit the Appellate Division to review Petitioner's claims on direct appeal and, to the extent Petitioner's motion involved facts outside the record, it should be denied as Petitioner was not deprived of his constitutional right to counsel.  USR 3.

Petitioner subsequently applied for leave to reargue his motion to vacate pursuant to C.P.L.R. § 2221.  *See* SR 145-47, Notice of Reargument, 148-86,

28

Memorandum in Support of Reargument.  The People opposed Petitioner's application.

SR 187.  On August 16, 2017, County Court denied Petitioner's application.  USR 6-7.

### E.  Direct Appeal

Petitioner appealed his judgment of conviction to the Appellate Division, Third

Department.  *People v. Santana*, 179 A.D.3d 1299 (3rd Dep't 2020);[7] *see also* SR 191-

488, Petitioner's Appellate Division Brief and Appendix, SR 489-534, The People's

Appellate Division Brief and Appendix.  Petitioner argued: (1) County Court erred in

denying Petitioner's motion to vacate without holding a hearing (SR 215-17); (2)

Petitioner was deprived the effective assistance of counsel based on trial counsel's (a)

failure to retain an expert witness and introduce evidence which would have

contradicted Ms. Santana's claims, (b) withdrawal of a motion to suppress and failure to

move to exclude interrogation videotape footage and telephone conversation recording,

and (c) other errors which cumulatively deprived Petitioner of effective assistance (SR

217-26); (3) the admission of prior consistent statements improperly bolstered the

People's case, undermined the defense, and deprived Petitioner of due process and a

fair trial (SR 226-32); (4) the jury's verdict was not supported by legally sufficient

evidence and was against the weight of the evidence (SR 232-35); and (5) County

Court abused its discretion in imposing Petitioner's sentence, therefore, the Appellate

Division should modify said sentence in the interest of justice (SR 236-40).  The People

responded: (1) no hearing was required on Petitioner's motion to vacate (SR 496-97);

(2) Petitioner was provided meaningful representation (SR 498-99); (3) prior consistent

statements were properly admitted to demonstrate prompt outcry and/or were excited

---

[7] A copy of the Appellate Division's Memorandum and Order affirming Petitioner's judgment of conviction
is also included in the Unsealed State Court Records.  *See* USR 9-15.

utterances (SR 500-01); (4) the evidence was legally sufficient to support Petitioner's conviction and the jury's verdict was not against the weight of the evidence (SR 502-04); and Petitioner's sentence was neither harsh nor excessive (SR 505-06).

On January 16, 2020, the Appellate Division affirmed Petitioner's judgment of conviction. *Santana*, 179 A.D.3d at 1304. The Third Department rejected Petitioner's argument that County Court erred in denying Petitioner's §440.10 motion without a hearing, explaining:

> [Petitioner] contends that he was deprived of the effective assistance of counsel because defense counsel failed to present evidence – a physical examination of the victim that showed that "no physical evidence of blunt force penetrating trauma" – to counter the allegations against him. However, proof of physical injury is not required for [Petitioner]'s convictions . . . and, further, the evidence would not have contradicted the victim's claims because the victim testified that [Petitioner] inappropriately touched her and did not accuse [Petitioner] of any blunt force penetration. Thus, defense counsel had a legitimate explanation for his conduct. In light of the foregoing, County Court properly denied [Petitioner']s CPL 440.10 motion without a hearing, as [Petitioner] did not support his claim of ineffective assistance of counsel with factual allegations that, if established, would entitle him to relief[.]

*Id.* at 1303-04 (citing C.P.L. §§ 130.45(1) & 130.60(2)) (additional citations and quotations omitted).[8] Turning to County Court's admission of testimony about the victim's disclosure of sexual abuse, the Appellate Division first found Petitioner's claim

---

[8] The Appellate Division also rejected Petitioner's ineffective assistance claim, finding Petitioner "failed to show absence of a strategic reason for defense counsel's conduct" in withdrawing the request for a *Huntley* hearing and failing to move to preclude the interrogation videotape footage and telephone conversation recordings because Petitioner "denied the victim's accusations in both the interview and phone call, which coincided with defense counsel's trial strategy." *Santana*, 179 A.D.3d at 1302 (citations omitted). The Third Department further held Petitioner's "additional claims – related to defense counsel's failure to make certain motions and objections – [we]re also lacking in merit as there can be no denial of effective assistance of . . . counsel arising from counsel's failure to make a motion or argument that has little or no chance of success[.]" *Id.* (internal quotations and citations omitted).

"unpreserved" as Petitioner failed to object to the statements at trial, but further observed "[i]n any event, were this issue before us we would find that the . . . testimonies regarding the victim's disclosure of sexual abuse shortly after the incident were properly admitted as prompt outcry evidence."  *Id.* at 1302 (citations omitted).[9]

Petitioner applied for a certificate granting leave to appeal the Appellate Division's decision to the Court of Appeals.  *See* SR 535-46.  On April 21, 2020, the Court of Appeals denied Petitioner's leave application.  *People v. Santana*, 35 N.Y.3d 973 (2020).[10]

## III.   PETITION

Petitioner challenges his 2015 judgment of conviction for Criminal Sexual Act in the Second Degree, Sexual Abuse in the Second Degree, and Endangering the Welfare of a Child in Montgomery County Court following jury trial.  *See generally*, Pet. Petitioner argues he is entitled to federal habeas relief because: (1) Petitioner was denied the effective assistance of counsel based on counsel's "fail[ure] to retain an expert in sexual abuse/trauma to assist in [Petitioner's] defense" and "failure to properly investigate the allegations and call Curtis FNP-C who examined the victim [sic] and found 'no physical evidence . . . of blunt force penetrating trauma'" (Pet. at 5-6 (cleaned

---

[9] Similarly, the Third Department concluded Petitioner failed to preserve his legal sufficiency claim "by failing to make a timely, detailed motion for a trial order of dismissal[.]"  *Santana*, 179 A.D.3d at 1300 (citations omitted).  Concerning the jury's verdict, the Appellate Division was "unpersuaded" by Petitioner's argument "that the verdict was not supported by the weight of the evidence because his testimony contradicted that of the victim[,]" explaining, "the victim was cross-examined and any aspect of their testimony that could have been perceived as inconsistent or improbable was fully explored and presented to the jury, which was entitled to credit her testimony[.]"  *Id.* at 1301 (citations omitted).  Finally, the Third Department rejected Petitioner's contention that the sentence imposed by County Court, "which fell within the statutory parameters, was harsh or excessive" and found "no extraordinary circumstances or abuse of discretion warranting a reduction of the sentence in the interest of justice[.]"  *Id.* at 1303 (citations omitted).
[10] A copy of the Court of Appeals' Opinion denying Petitioner's application for leave to appeal is also included in the Unsealed State Court Records.  *See* USR 16.

up)); (2) the trial court's admission of prior consistent statements "improperly bolstered the People's case and concomitantly undermined the defense[,]" in violation of Petitioner's rights to "due process and a fair trial" (Pet. at 5-6); and (3) Petitioner's rights under *Brady v. Maryland* were violated (Pet. at 7). Respondent contends: (1) the Appellate Division reasonably rejected Petitioner's ineffective assistance claim (Dkt. No. 15-1 at 12-20); (2) Petitioner's evidentiary claim is procedurally barred on independent and adequate state law grounds and, in any event, is meritless (Dkt. No. 15-1 at 20-25); and (3) Petitioner's *Brady* claim is unexhausted and should be denied as plainly meritless (Dkt. No. 15-1 at 25-27).

## IV.    DISCUSSION

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *Premo v. Moore*, 562 U.S. 115, 120-21 (2011); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt."  *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (internal quotation marks and citation omitted).  "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502

U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

### A.  Ineffective Assistance of Trial Counsel

Petitioner first contends habeas corpus relief is warranted here because trial counsel, "without conducting an independent investigation[,] compel[led] Petitioner to face a trial for a crime that [Petitioner] did not commit" and if trial counsel had "done proper investigation, he would have uncovered compelling evidence of Petitioner's innocence and . . . presented different defenses[; therefore,] the out[]come of the tri[a]l would have been different."  Pet. at 5.  Respondent argues the Third Department reasonably rejected Petitioner's ineffective assistance claim on direct appeal, therefore, Petitioner is not entitled to habeas relief.  Dkt. No. 15-1 at 12-20.

To prove he was denied the effective assistance of counsel, a convicted defendant must demonstrate: (1) "counsel's performance was deficient" and (2) counsel's "deficient performance prejudiced the defense."  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In order to demonstrate counsel's performance was deficient, "a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.'"  *Harrington v. Richter*, 562 U.S. 86, 104 (2010) (quoting *Strickland*, 466 U.S. at 688).  Counsel's performance is deemed to have prejudiced the defense where "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Strickland*, 466 U.S. at 687. Therefore,"[t]o establish *Strickland* prejudice a defendant must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Lafler v. Cooper*, 566 U.S. 156, 163 (2012)

(quoting *Strickland*, 466 U.S. at 694). An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *Strickland*, 466 U.S. at 697.

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105. When evaluating an ineffective assistance claim on habeas review, "the question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect[,] but whether that determination was unreasonable— a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro*, 550 U.S. at 473) (internal quotations omitted). Therefore, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

In denying Petitioner's ineffective assistance claim on direct appeal, the Third Department held "defense counsel presented a clear trial strategy, effectively cross-examined witnesses and made appropriate opening and closing statements and, thus, provided [Petitioner] with meaningful representation[.]" *Santana*, 179 A.D.3d at 1302 (citations omitted). In affirming the trial court's denial of Petitioner's motion to vacate– wherein Petitioner argued he was denied the effective assistance of counsel based on, *inter alia*, trial counsel's "fail[ure to] use the Medical Report and/or present witnesses on [Petitioner]'s behalf to demonstrate" Petitioner's innocence –the Appellate Division observed "proof of physical injury [wa]s not required for [Petitioner]'s convictions" and

"the evidence would not have contradicted the victim's claims" therefore, Petitioner had

not established that trial counsel was ineffective.  SR 69; *Santana*, 179 A.D.3d at 1303-

04.  Petitioner has failed to demonstrate the Third Department's denial of his ineffective

assistance claim was unreasonable.

Concerning trial counsel's failure to present the "Decker Drive Pediatrics"

document signed by Certified Family Nurse Practitioner Danita Curtis, Petitioner

appears to have argued both that his attorney was unaware of the written statement

made by FNP-C Curtis because counsel failed to conduct an adequate investigation

*and* that trial counsel was aware of FNP-C Curtis' written statement yet failed to

introduce it at trial.  *Compare* Pet. at 5 ("Had [Petitioner's] attorney done [a] proper

investigation, he [would] have uncovered compelling evidence of Petitioner's

innocence[.]") *with e.g.*, SR 219 (Petitioner asserting, in his counseled brief to the

Appellate Division that "both [Petitioner] and his defense attorney were made aware of

the examination because they had requested it[.]").  Irrespective of defense counsel's

awareness of the "Decker Drive Pediatrics" document, however, the Third Department's

conclusion– that the evidence at issue would not have contradicted the victim's claims –

was not unreasonable.

The document which Petitioner claims his attorney was ineffective for failing to

introduce at trial states:

> Shanice was brought to the office by [Joan Santana], (her
> mother) for evaluation of sexual abuse on 06/10/2014 . . .
> Interview of child with **positive** disclosure of genital touching
> by father.
> No physical evidence on exam of blunt force penetrating
> trauma. Hymen edges are smooth with no notches or clefts.
> (Shanice chose not to have her mother present for the exam

> but was afraid she would be upset with her for not wanting her
> there). Shanice was given reassurance.

SR 131 (emphasis in original).  The document was signed by Danita Curtis, FNP-C on

April 13, 2015.  SR 131.

Petitioner was accused of committing a Criminal Sexual Act in the Second

Degree, Sexual Abuse in the Second Degree, and Endangering the Welfare of a Child;

on or about June 2, 2014.  SR 16-17.  Under New York law, "[a] person is guilty of

criminal sexual act in the second degree when . . . being eighteen years old or more, he

or she engages in oral sexual conduct or anal sexual conduct with another person less

than fifteen years old[.]"  P.L. § 130.45(1).  Additionally, "[a] person is guilty of sexual

abuse in the second degree when he or she subjects another person to sexual contact

and when such other person is . . . [l]ess than fourteen years old."  P.L. § 130.60(2).

Finally, "[a] person is guilty of endangering the welfare of a child when . . . [he]

knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare

of a child less than seventeen years old[.]"  P.L. § 260.10(1).

Contrary to Petitioner's assertions, none of FNP-C Curtis' conclusions contained

in the document are exculpatory.  First, FNP-C Curtis' findings do not call into question

any of the elements which the People were required to prove to convict Petitioner of the

charged offenses.  While FNP-C Curtis' evaluation of the victim on June 10, 2014, found

"no physical evidence of blunt force penetrating trauma[,]" proof of penetrating trauma

or physical injury were not required to prove Petitioner engaged in a Criminal Sexual Act

or Sexual Abuse.  *See* P.L. §§ 130.45(1), 130.60(2).

In other words, evidence that the victim did not suffer "penetrating trauma" as a

result of Petitioner's actions would not tend to contradict the People's case– that

Petitioner "engaged in oral sexual conduct . . . with another person less than fifteen years old" and "subject[ed]" the victim, who was "[l]ess than fourteen years old[,]" to "sexual contact[.]"  *See* P.L. §§ 130.45(1), 130.60(2).  Therefore, the Appellate Division's conclusion– that Petitioner failed to demonstrate how trial counsel's failure to introduce the document amounted to ineffective assistance because "proof of physical injury [wa]s not required for [Petitioner]'s convictions" –was not unreasonable.  *Santana*, 179 A.D.3d at 1303-04; *see Swan v. Martuscello*, No. 9:16-CV-1138 (JKS), 2018 WL 6179428, at *6 (N.D.N.Y. Nov. 27, 2018) (concluding defense counsel's failure to present "the victim's allegedly [] exculpatory medical records" did not constitute ineffective assistance noting "the evidence [Petitioner] identifie[d wa]s not exculpatory and largely irrelevant" therefore Petitioner could not "establish any reasonable probability of a different result had the evidence been introduced.") (additional quotations omitted); *United States v. Sapia*, No. 1:02-CV-0649, 2002 WL 620483, at *9 (S.D.N.Y. Apr. 18, 2002) (counsel was not ineffective for failing to investigate "*Brady* material" where the document at issue did not "have any bearing on [the Petitioner's] guilt.").

        Moreover, Petitioner has failed to demonstrate that any of FNP-C Curtis' statements contained in the "Decker Drive Pediatrics" document have contradicted the victim's testimony at trial.  The victim testified that when she woke up around 2:00 or 3:00 a.m., she saw Petitioner and "felt something" which "felt like something in [her] butterfly."  T 271-73.  The victim explained she felt "[a] finger" touch "[t]he inside" of her vagina and recalled it "hurt."  T 273-74.  After Petitioner left and the victim fell back asleep, the victim recounted she woke up again and saw Petitioner in a "kneeled"

position next to her bed and felt "[s]omeone [sic] taking off [her] underwear and [her] shorts."  T 275-77.  The victim testified she next felt "a tongue in [her] butterfly" and heard "[a] slurping sound."  T 276-77.

Petitioner argues the document "completely and unequivocally contradict[s]" the victim's testimony because:

> Ms. Santana testified that her father penetrated her vagina with his finger, but the doctor's examination revealed no evidence of penetration. Ms. Santana further testified that the penetration "hurt[,]" but the doctor's examination revealed no evidence of tra[u]ma and the hymen edges [we]re smooth with no notches or clefts.

Traverse at 4.  Petitioner's attempt to distort the evaluation's findings is unpersuasive.

First, FNP-C Curtis' finding of "no physical evidence . . . of *blunt force penetrating trauma*" upon evaluation of the victim, more than one week after the alleged Criminal Sexual Act/Abuse would not rebut the victim's claims that she felt a "[a] finger" touch "[t]he inside" of her vagina and "a tongue in [her] butterfly[.]"  *See* SR 131 (emphasis added); T 273-77.  Nor would the evaluator's conclusions alone belie the veracity of the victim's statement that the contact "hurt."  *See* T 273.  Therefore, the Appellate Division's conclusion– that Petitioner was not denied the effective assistance of counsel because "the evidence would not have contradicted the victim's claims" –was not unreasonable.  *Santana*, 179 A.D.3d at 1304; *see Taylor v. Coveny*, No. 9:17-CV-1124 (JKS), 2019 WL 2524700, at *10 (N.D.N.Y. June 19, 2019) (holding the state court's denial of Petitioner's ineffective assistance claim was not unreasonable where Petitioner claimed trial counsel was ineffective for failing to "call an expert witness to compare [the victim]'s injuries to the impressions of [Petitioner]'s boots and the shoes of his accomplices" and introduce "a report from an FBI investigator who had examined the

impressions" which "stated that certain impressions could not be matched to [Petitioner]'s boots" because "the report [wa]s not exculpatory" and the investigator "would not have undermined [witness] testimony that [Petitioner] kicked the victim or the victim's blood found on [Petitioner]'s boot.").

Turning to Petitioner's claim that his attorney provided ineffective assistance because trial counsel "failed to retain an expert in sexual abuse/trauma to assist in [Petitioner's] defense[,]" Petitioner has failed to demonstrate that the Appellate Division's denial of his claim was unreasonable. Pet. at 6. To the extent Petitioner avers counsel was ineffective for failing to call FNP-C Curtis to testify to the results of the victim's medical evaluation, as explained above, FNP-C Curtis' conclusions neither contradicted the victim's testimony nor negated any element of any of the offense which the People sought to prove. Therefore, defense counsel's failure to call FNP-C Curtis did not deprive Petitioner of the effective assistance of counsel. *See Taylor*, 2019 WL 2524700, at *10.

Furthermore, to the extent Petitioner faults defense counsel for failing to conduct further investigations and consult with or call some unidentified expert witness, Petitioner's claim remains unavailing. Petitioner's speculation as to what evidence further investigation by counsel may have revealed and how an expert witness may have testified are wholly insufficient to satisfy *Strickland*. *See, e.g.*, *Smith v. Ercole*, No. 9:08-CV-0351 (GLS/ATB), 2010 WL 6595338, at *23 (N.D.N.Y. June 16, 2010), *report and recommendation adopted*, 2011 WL 1748545 (N.D.N.Y. May 6, 2011) (holding the state court's denial of Petitioner's claim that counsel was ineffective for failing to hire an investigator and identify additional witnesses "was not contrary to or an unreasonable

application of the *Strickland* standards" noting "[P]etitioner provide[d] no specifics to support his conclusory claim that these potential witnesses could have provided helpful testimony . . . [and] conclusory allegations that trial counsel was ineffective for failing to investigate and call witnesses do not support a viable claim under *Strickland*.") (citations and footnote omitted); *Blond v. Graham*, No. 9:12-CV-1849 (JKS), 2014 WL 2558932, at *10 (N.D.N.Y. June 6, 2014) (rejecting Petitioner's ineffective assistance claim based on trial "counsel['s] fail[ure] to call 'any medical experts on sexual abuse and rape'" noting Petitioner "fail[ed] to specify which other witnesses should have been called or what would have been the thrust of their testimony") (citations omitted); *McPherson v. Greiner*, No. 1:02-CV-2726, 2003 WL 22405449, at *25 (S.D.N.Y. Oct. 22, 2003) (holding Petitioner's speculation about "what exculpatory evidence a proper investigation would have revealed, or how such evidence would have benefitted [Petitioner]'s case . . . satisfies neither *Strickland*'s deficient performance nor prejudice prongs.") (internal quotations and citation omitted); *Ross v. Racette*, No. 6:15-CV-6472, 2018 WL 1718057, at *10 (W.D.N.Y. Apr. 8, 2018) (concluding "Petitioner's assertions of prejudice [we]re entirely speculative" because Petitioner "ha[d] not explained how the defense would have benefitted as the result of trial counsel calling [a] DNA expert as a rebuttal witness.") (citing *Carr v. Senkowski*, No. 01-CV-0689, 2007 WL 3124624, at *21 (W.D.N.Y. Oct. 23, 2007) ("a petitioner does not show that he was prejudiced by trial counsel's alleged deficient performance merely by asserting that certain witnesses *might* have supplied relevant testimony; rather, he must state exactly what testimony they would have supplied and how such testimony would have changed the result.") (emphasis in original) (collecting cases)).

Additionally, Petitioner's case is factually distinguishable from those in which the Second Circuit has found defense counsel's failure to consult with an expert witness amounted to ineffective assistance. *See generally*, *Ridgeway v. Zon*, No. 1:05-CV-0363, 2009 WL 3464140, at *8 (W.D.N.Y. Oct. 21, 2009) (explaining "[t]he Second Circuit has held that under certain circumstances involving sexual offenses, the failure to call an expert witness may be grounds for an ineffective assistance of counsel claims.") (citing *Lindstadt v. Keane*, 239 F.3d 191 (2d Cir. 2001); *Pavel v. Hollins*, 261 F.3d 210 (2d Cir. 2001); and *Gersten v. Senkowski*, 426 F.3d 588 (2d Cir. 2005)), *affirmed*, 424 F. App'x 58 (2d Cir. 2011). Unlike the allegations against the defendants in *Lindstadt*, *Eze*, and *Pavel*, Petitioner was accused of oral sexual contact with the victim and sexual contact using his fingers. T 271-77, Testimony of Ms. Santana (describing the nature of the alleged Criminal Sexual Act/Abuse).[11] Here, because of the nature of the allegations, Petitioner's trial did not involve the same physical evidence issues. *See Affser v. Murray*, No. 1:04-CV-2715, 2008 WL 2909367, at *5 (E.D.N.Y. July 28, 2008)

> Petitioner's case is easily distinguishable from *Lindstadt* . . . , *Eze* . . . , and *Pavel* . . . , three sexual abuse cases in which the Second Circuit held that failure to consult or call a medical expert was an error that, in combination with other errors, could amount to ineffective assistance . . . In *Lindstadt* and *Eze*, medical experts testified that minimal physical evidence was indicative of sexual abuse including vaginal penetration . . . In *Pavel*, there was [a] . . . mismatch between the complete lack of physical evidence in the case of one of the victims, and the minimal physical evidence in the case of the other victim, and the allegations the victims made that they were anally

---

[11] *See also* T 375-76, Testimony of Detective Spaulding (explaining the Amsterdam Police Department did not recommend testing for "[p]enetration, rape, [or] anything to that affect" because "the allegation wasn't that [Petitioner] had sex with [Ms. Santana] using his penis. She had said that it was oral contact and him using . . . his fingers" and "a rape kit" would be utilized where a victim alleged "penis to vagina penetration").

> sodomized at least weekly . . . In contrast, in petitioner's case, as a matter of commonsense, the lack of physical evidence was to be expected because the allegations were limited to fondling.

(citing *Eze v. Senkowski*, 321 F.3d 110, 115-28 (2d Cir. 2003)) (additional quotations and citations omitted); *Brewer v. Eckert*, No. 6:19-CV-6486, 2020 WL 10061923, at *11 (W.D.N.Y. Sept. 10, 2020) (explaining "in Petitioner's case, the lack of physical evidence was unsurprising given that the complainants alleged that Petitioner compelled them to perform oral sex on him and fondled their vaginas. Unlike *Eze*, *Lindstadt*, and *Pavel*, the assaults . . . did not involve vaginal or anal intercourse.") (citations omitted).

Petitioner's trial is further distinguishable from the cases discussed above because the prosecutor did not rely on expert witness testimony.[12]  For example, in concluding the state court's application of *Strickland* was unreasonable in *Gersten*, the Second Circuit observed "[t]he prosecution's case rested centrally on the alleged victim's testimony and its *corroboration by the indirect physical evidence as interpreted*

---

[12] *See Gersten*, 426 F.3d at 594-95 (the prosecution called as a witness a doctor who conducted a physical examination of the victim and testified "in her professional opinion, her findings 'were highly suggestive of penetrating trauma to the hymen and chronic irritation of the . . . posterior fourchette and perihymenal tissues; and tearing of the mucosa of the rectum due to the stretching out of the rectal mucosa-of the anal mucosa.'"); *Lindstadt*, 239 F.3d at 195-96 (the prosecution called as a witness a "pediatrician who examined the child" and testified that he: (1) observed "bumps and clefts on the hymen" which the expert concluded were "consistent with sexual abuse[,]" relying on "a 'Boston study'" and (2) conducted "toluidine blue dye testing," which revealed "some scarring of the child's posterior fourchette . . . consistent with intrusion into or rubbing of the vaginal area due to sexual abuse.") (additional quotations omitted); *Eze*, 321 F.3d at 115-16 (the prosecutor called a doctor who "examined both girls . . . and found evidence of sexual abuse" as a witness who testified at trial he: (1) "concluded 'beyond a reasonable degree of medical certainty that [one victim] was sexually abused'" and (2) "'would say, with a reasonable degree of medical certainty, that [his] findings [upon examination of the other victim] were consistent with that abuse.'"); *Pavel*, 261 F.3d at 214-15 ("the prosecution called a medical expert . . . [who] testified that she reviewed the records of the physical examination of the victims and testified: (1) the "discoloration of the skin . . . around the anal area" documented during one of the victim's examinations "was 'consistent' with [that victim's] account of sexual abuse" and (2) another victim "might have been anally sodomized as he described without any physical indication of the sodomy remaining after the fact.") (additional quotations omitted).

*by the* [prosecution's] *medical expert.*"  *Gersten*, 426 F.3d at 608 (emphasis added).

Here, by contrast, the People presented no expert testimony which could have served

as additional "corroboration that any crime occurred[.]"  *Id.*  Therefore, Petitioner is

necessarily unable to demonstrate that his defense was prejudiced by counsel's failure

to consult with or call a defense expert who could have aided defense counsel in

undermining the People's expert by developing questions for cross-examination or

presenting a contradictory interpretation of the prosecution's evidence.  Moreover,

Petitioner's defense could not have been prejudiced by defense counsel's

understanding, or lack thereof, of the "vagaries of abuse indicia" emphasized by the

Second Circuit in *Lindstadt*, *Eze*, and *Pavel*.  *See Affser*, 2008 WL 2909367, at *5

("unlike *Lindstadt*, *Eze*, and *Pavel*, no prosecution expert interpreted the physical

evidence as affirmatively indicative of abuse. Thus, petitioner's case did not turn on

defense counsel's understanding the vagaries of abuse indicia.") (citing *Eze*, 321 F.3d

at 128; *Pavel*, 261 F.3d at 224; and *Lindstadt*, 239 F.3d at 201)); *Brewer*, 2020 WL

10061923, at *11 (observing "[a]n additional difference" between the Petitioner's trial–

where a pediatrician called by the prosecution as a medical expert "examined . . . [the

victims but] found no physical signs of the sexual abuse they had disclosed" –and *Eze*,

*Lindstadt*, and *Pavel*) (citations omitted).

Finally, Petitioner's case is dissimilar to *Lindstadt*, *Eze*, and *Pavel* because, in

those cases, the petitioners were prejudiced by the multiple deficiencies of their

respective attorneys.  *See Eze*, 321 F.3d at 136-37 (identifying eight deficiencies in trial

counsel's representation); *Lindstadt*, 239 F.3d at 199-204 (identifying four errors made

by defense counsel); *Pavel*, 261 F.3d at 216-26 (identifying "three distinct ways" in

which trial counsel's representation of the petitioner was "flawed" and concluding "the *cumulative* weight of these flaws deprived [the petitioner] of his Sixth Amendment rights[.]") (emphasis in original).  Here, Petitioner is unable to prove the aggregate effect of multiple errors– including the failure to consult with or call as a witness a medical expert –is sufficient to establish constitutionally deficient conduct.  *See Beauharnois v. Chappius*, No. 9:12-CV-1283 (FJS/ATB), 2015 WL 893091, at *25 (N.D.N.Y. Mar. 2, 2015) (explaining "*Gersten* and the prior Second Circuit cases upon which it relies [we]re distinguishable from the instant case" because, *inter alia*, "*Eze*, *Pavel*, and *Lindstadt* involved a litany of significant ways in which trial counsel's representation was deficient" and, by contrast, "the other allegation[s] of ineffective assistance of trial counsel by this petitioner are without merit.") (citations omitted).

In sum, Petitioner has not established the state court unreasonably applied *Strickland* in denying his claim.  Therefore, habeas relief is not warranted.

### B. Admission of "Prompt Outcry" Testimony

Petitioner next avers he is entitled to habeas relief because he "was denied due process and a fair trial [based on the trial court's] erroneous admission of numerous prior consistent statement[s] of prosecution wit[]nesses, which improperly bolstered the People's case and concomitantly undermined the defense."  Pet. at 5.  Petitioner contends County Court's admission of such testimony was improper because:

> [T]he initial complaint was not made promptly after the alleged crime[;] . . . the prosecution elicited improper details about the complaint of sexual abuse[; a]nd . . . the prosecution's use of multiple witnesses to establish that the alleged victim had made the same complaint was duplicative and highly prejudicial to the defense.

Pet. at 5.  Respondent argues this claim is procedurally barred from habeas review on independent and adequate state law grounds and lacks merit.  Dkt. No. 15-1 at 20-25.

A "federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'"  *Walker v. Martin*, 562 U.S. 307, 315 (2011) (quoting *Beard v. Kindler*, 558 U.S. 53, 55 (2009)) (additional citations omitted).   "This rule applies whether the state law ground is substantive or procedural." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (citation omitted).  Furthermore, "even when a state court says that a claim is 'not preserved for appellate review' but then rules 'in any event' on the merits, such a claim is procedurally defaulted."  *Green v. Travis*, 414 F.3d 288, 294 (2d Cir. 2005) (quoting *Glenn v. Bartlett*, 98 F.3d 721, 725 (2d Cir. 1996)); *see also Hughes v. Sheahan*, 312 F. Supp. 3d 306, 340 (N.D.N.Y. 2018) (explaining "[e]ven if the state court considers the merits of an otherwise precluded claim, its reliance on a procedural ground as one basis for the denial of the claim precludes federal habeas review.") (citing *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989)) (additional citation omitted).

On direct appeal, the Third Department held Petitioner's challenge to County Court's admission of testimony concerning the victim's outcry was unpreserved because Petitioner failed to object to the admission of said statements at trial.  *Santana*, 179 A.D.3d at 1302.[13]  Federal habeas corpus review of Petitioner's evidentiary claim will be

---

[13] *See also Richardson v. Greene*, 497 F.3d 212, 218 (2d Cir. 2007).
> New York's preservation rule, codified at N.Y. Crim. P. Law § 470.05(2), "require[s], at the very least, that any matter which a party wishes the appellate court to decide have been brought to the attention of the trial court at a time and in a way that gave the latter the opportunity to remedy the problem and thereby avert reversible error."

(quoting *Garcia v. Lewis*, 188 F.3d 71, 78 (2d Cir. 1999)) (additional citations omitted).

barred if the Third Department's reliance on New York's preservation rule to deny

Petitioner's claim on direct appeal was "independent of the federal question and

adequate to support the judgment." *Coleman*, 501 U.S. at 729 (1991).

The Second Circuit has explained that New York's preservation rule "is a state

law ground . . . independent of any federal question[.]" *Garvey v. Duncan*, 485 F.3d

709, 720 (2d Cir. 2007). Accordingly, the Third Department's application of the

preservation rule was independent of the question presented here, *i.e.*, whether the trial

court erred in admitting the testimony at issue.

"To qualify as an 'adequate' procedural ground, a state rule must be 'firmly

established and regularly followed.'" *Walker*, 562 U.S. at 316 (citation omitted). Courts

in this circuit have consistently found New York's preservation rule to be "firmly

established and regularly followed." *See Downs v. Lape*, 657 F.3d 97, 104 (2d Cir.

2011) (noting "we have held repeatedly that the contemporaneous objection rule is a

firmly established and regularly followed New York procedural rule" and collecting

cases). Accordingly, the Appellate Division's denial of Petitioner's evidentiary claim

based on his failure to properly preserve it as required by New York law constitutes an

independent and adequate state law ground precluding habeas review.

Where, as here, "a state prisoner has defaulted his federal claims in state court

pursuant to an independent and adequate state procedural rule," the Petitioner may

avoid the procedural bar if he "can demonstrate cause for the default and actual

prejudice as a result of the alleged violation of federal law, or demonstrate that failure to

consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501

U.S. at 750. In his Traverse, Petitioner avers "[d]efense counsel's . . . failure to object to

46

said testimony amounted to ineffective assistance of counsel[.]"  Traverse at 5.[14]  While

"in certain circumstances counsel's ineffectiveness in failing properly to preserve [a]

claim for review in state court" may "constitute[] 'cause' to excuse a procedural default,"

Petitioner is unable to demonstrate his attorney's failure to object to testimony

concerning the victim's prompt outcry rendered his representation "so ineffective as to

violate the Federal Constitution."  *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000)

(citing *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986)).

As explained by the Appellate Division, even if defense counsel had objected the

admission of such testimony, the testimony "regarding the victim's disclosure of sexual

abuse shortly after the incident w[as] properly admitted as prompt outcry evidence[.]"

*Santana*, 179 A.D.3d at 1302 (citations omitted).  Under New York law, "evidence that a

victim of sexual assault promptly complained about the incident is admissible to

corroborate the allegation that an assault took place[.]"  *People v. McDaniel*, 81 N.Y.2d

10, 16 (1993) (citations omitted).  Petitioner argues the testimony elicited from the

People's witnesses does not constitute "prompt outcry" evidence because: (1) Ms.

Santana's "complaint[s] w[ere] not made promptly after the alleged crime[;]" (2) "the

prosecutor elicited improper details about the complaint[s;] and (3) "the prosecution's

use of multiple witnesses to establish that the alleged victim had made the same

complaint was duplicative and highly prejudicial to the defense."  Pet at 6.  Petitioner's

arguments are meritless.  *See Pierre v. Griffin*, No. 1:13-CV-6558, 2019 WL 1433043,

---

[14] *See also, e.g., Scott v. Fisher*, 652 F. Supp. 2d 380, 407 (W.D.N.Y. 2009) ("[c]onstruing [Petitioner]'s pro se petition liberally . . . as asserting that trial counsel's failure to object amounted to ineffective assistance . . . . constitute[ing] 'cause' to excuse the procedural default" of Petitioner's claim concerning the trial court's erroneous admission of statements) (citing *Williams v. Kullman*, 722 F.2d 1048, 1050-51 (2d Cir. 1983)).

at *7-8 (E.D.N.Y. Mar. 22, 2019) (rejecting Petitioner's claim that the trial court improperly admitted "prompt outcry" evidence as procedurally barred where the Appellate Division found Petitioner's claim partially unpreserved based on defense counsel's failure to object to the admission of such testimony at trial and concluding, to the extent the claim was properly preserved, Petitioner's argument that the use of "prompt outcry" testimony constituted improper bolstering was meritless).

Concerning the timeliness of Ms. Santana's outcry, the New York Court of Appeals has held "[a] complaint is timely for purposes of the prompt outcry exception if made 'at the first suitable opportunity'" but noted there is "'no iron rule on the subject' . . . promptness is a relative concept dependent on the facts—what might qualify as prompt in one case might not in another." *McDaniel*, 81 N.Y.2d at 17 (quoting *People v. O'Sullivan*, 104 N.Y. 481, 486 (1887); *Higgins v. People*, 58 N.Y. 377, 379 (1874)). Ms. Santana testified the first incident began sometime around 2:00 or 3:00 a.m. on June 2, 2014, and the second incident occurred sometime thereafter, before Ms. Santana went to school that morning. T 271-78. Figueroa testified Ms. Santana disclosed what Petitioner had done at school during homeroom on June 2, 2014; Rodriguez testified Ms. Santana reported the abuse to her at school during lunch on June 2, 2014;[15] and Peconie testified Ms. Santana requested to stay at her home and subsequently disclosed Petitioner's actions at least one day prior to seeking assistance from the school nurse on June 4, 2014. T 328-29, 339-40, 345-47. Petitioner has not identified any support for his apparent argument that Ms. Santana's outcries– which occurred later the day of, or the day after, the alleged abuse –were not "prompt." *See McDaniel*,

---

[15] Ms. Rodriguez testified Ms. Santana disclosed the abuse to her on "Monday" during the first week of June in 2014. T 339-40. June 2, 2014, was a Monday.

81 N.Y.2d at 17 (holding the victim's outcries, which occurred "on the mornings following each incident, unquestionably satisf[ied] the first-suitable-opportunity requirement."); *see also People v. Stearns*, 72 A.D.3d 1214, 1218 (3rd Dep't 2010) (holding testimony "that the victim disclosed the rape to [the witness] the morning after it had occurred was properly admitted under the prompt outcry exception to the hearsay rule since the report was made at 'the first suitable opportunity[.]'") (citations omitted), *leave denied*, 15 N.Y.3d 778 (2010); *People v. Evangelista*, 155 A.D.3d 972, 972-73 (2nd Dep't 2017) (holding "trial court properly admitted evidence of the victim's outcry to her parents" where the "victim's first 'outcry' to her parents [occurred] approximately 4 1/2 years after the abuse had ended" explaining, "[u]nder all of the circumstances of this case, including the victim's young age, the ongoing and familial relationship between the victim and the defendant, . . . and the victim's fear of making the complaint sooner," admission of the victim's outcry was proper.) (citations omitted), *leave denied*, 31 N.Y.3d 1013 (2018); *People v. Felix*, 32 A.D.3d 1177, 1178 (4th Dep't 2006) ("Although the victim informed one of the witnesses of the attack two days after it occurred and she informed the other witness of the attack three days after it occurred, we nevertheless conclude that the testimony was properly admitted under the prompt outcry exception to the hearsay rule[.]") (citations omitted), *leave denied*, 7 N.Y.3d 925 (2006).

Turning to the nature of the details elicited by the prosecutor, New York's highest Court has explained a witness's testimony "—that [the victim] reported being bothered, attacked, [and] molested—did not exceed the allowable level of detail." *McDaniel*, 81 N.Y.2d at 18. Here, Figueroa testified Ms. Santana "t[old Figueroa] that her dad had molested her[;]"Rodriguez testified Ms. Santana "said that her dad came in her room

and he molested her and touched her down there[;]" and Peconie testified Ms. Santana said "[h]er father did something to her, he touched her and stuff like that in bad ways." T 329, 339, 346. None of the three witnesses who reported Ms. Santana's prompt outcry exceeded the permissible level of detail in their testimony.

Petitioner's claim that the People's "use of multiple witnesses to establish" Ms. Santana reported Petitioner's abuse "was duplicative and highly prejudicial" is similarly unsupported. *See* Pet at 6. Rather, New York courts have consistently approved of the admission of prompt outcry testimony from multiple witnesses. *See, e.g.*, *Felix*, 32 A.D.3d at 1178 (rejecting the defendant's argument that the trial court "erred in permitting *two witnesses* to testify that the victim informed them that defendant attacked her.") (emphasis added); *People v. Santos*, 243 A.D.2d 276, 662 (1st Dep't 1997) (holding "[s]tatements by the victim were properly admitted as prompt outcries since they were made at the first suitable opportunity and because only the fact of a complaint was elicited" and "the *seriatim* outcries to two different listeners were admissible since they were both prompt under the circumstances[.]") (citations omitted), *leave denied*, 91 N.Y.2d 880 (1997); *People v. Morales*, 34 A.D.3d 396, 396 (1st Dep't 2006) (holding "[t]he [trial] court properly admitted, as prompt outcries, the testifying victim's reports of the sexual assault in both her 911 call and her conversation with a responding officer" because "[e]ach qualified, under its own circumstances, as a sex crime victim's prompt outcry . . . and thus both were admissible[.]") (citations omitted), *leave denied*, 8 N.Y.3d 925 (2007); *People v. Chin*, 205 A.D.3d 819, 820 (2nd Dep't 2022) (holding "[t]he defendant's contention that certain testimony from four witnesses did not fall within the prompt outcry exception to the hearsay rule is partially unpreserved for appellate review

50

. . . and, in any event, without merit[.]") *leave denied*, 38 N.Y.3d 1070 (2022); *see also People v. Fabian*, 213 A.D.2d 298, 299 (1st Dep't 1995) (explaining "the rule that a prompt outcry must be made 'at the first suitable opportunity' . . . does not necessarily undermine the admissibility of *seriatim* outcries to different listeners provided that each outcry qualifies as 'prompt' under its own circumstances[.]") (citations omitted), *leave denied*, 85 N.Y.2d 972 (1995).

In sum, Petitioner has failed to prove the admission of testimony concerning the victim's prompt outcry was improper.  Therefore, defense counsel's failure to object to Figueroa, Rodriguez, and Peconie's testimony about Ms. Santana's outcry did not amount to ineffective assistance.  *See Lockhart v. Fretwell*, 506 U.S. 364, 374 (1993) (failing to make a meritless objection cannot constitute prejudice under a *Strickland* ineffective assistance of counsel claim).  Accordingly, Petitioner is unable to establish "cause" sufficient to excuse the procedural default of his evidentiary claim and habeas relief is not available.  *See, e.g.*, *Galusha v. Duncan*, No. 9:02-CV-1602 (DNH/GJD), 2007 WL 4198272, at *14 (N.D.N.Y. Nov. 21, 2007) (explaining that,  "[b]ecause Petitioner ha[d] not demonstrated cause for his procedural default, the court need not decide whether he has suffered prejudice as the result.") (citing *Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985); *Pou v. Keane*, 977 F. Supp. 577, 581 (N.D.N.Y. 1997)).

Nor can Petitioner prove this Court's failure to consider Petitioner's evidentiary claim would "result in a fundamental miscarriage of justice."  *Coleman*, 501 U.S. at 750. "A habeas petitioner may bypass the independent and adequate state ground bar by demonstrating a constitutional violation that resulted in a fundamental miscarriage of justice, i.e., *that he is actually innocent of the crime for which he has been convicted*."

*Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002) (citing *Schlup v. Delo*, 513 U.S. 298, 321 (1995); *Carrier*, 477 U.S. at 496) (emphasis added).  The Supreme Court has explained "prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'"  *House v. Bell*, 547 U.S. 518, 536-37 (2006) (quoting *Schlup*, 513 U.S. at 327).  Here, Petitioner has not produced any new evidence that he is actually innocent; therefore, there is no basis to conclude this Court's failure to consider Petitioner's claim would result in a fundamental miscarriage of justice.  *See, e.g., Baptiste v. Ercole*, 766 F. Supp. 2d 339, 365 (N.D.N.Y. 2011) (citing *House*, 547 U.S. at 536-39; *Schlup*, 513 U.S. at 327).

In sum, because Petitioner's evidentiary claim is procedurally barred on independent and adequate state law grounds and Petitioner has failed to prove either cause for the default and resulting prejudice or that the failure to consider his claim would result in a fundamental miscarriage of justice, the undersigned may not review Petitioner's claim.

### C.  *Brady v. Maryland*

Finally, Petitioner avers he is entitled to habeas relief because "[t]he [sic] violated *Brady v. Maryland* and counsel failed to present Bra[d]y material."  Pet. at 7.  In the instant petition, he claims that:

> About two weeks after the jury found Petitioner guilty, [Petitioner's] wife furnished him with a copy of a Medical/Letter showing that a Medical Examination was performed on the alleged victim and the underlying Medical Report clearly shows that there was 'no physical evidence of blunt force penetrating trauma . . . ' Had defense counsel used this 'exculpatory evidence' at [sic] trial, the verdict would have been different.

*Id.* Respondent contends this claim is unexhausted but plainly meritless, therefore, dismissal is warranted. Dkt. No. 15-1 at 25-27.

An application for a writ of habeas corpus may not be granted until a petitioner has exhausted all remedies available in state court unless "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(A)-(B)(ii); *see also*, *e.g.*, *Abuzaid v. Mattox*, 726 F.3d 311, 321 (2d Cir. 2013) (explaining Section 2254 "prohibits federal courts from granting relief to an applicant who has not exhausted the remedies available in the courts of the State," but allows "federal courts to deny the petition, regardless of whether the applicant exhausted his state court remedies.") (internal quotation marks omitted). In other words, a habeas Petitioner is required to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

Petitioner failed to allege a violation of his rights under *Brady v. Maryland* in either his Motion to Vacate or counseled direct appeal. *See* SR 64-139, Memorandum of Law and Exhibits in Support of Motion to Vacate; SR 191-488, Petitioner's Appellate Division Brief and Appendix.[16] Accordingly, the instant claim is unexhausted. However,

---

[16] While Petitioner argued he was "deprived of the right to the effective assistance of counsel when counsel failed to present *Brady* material that [Petitioner] was actually innocent" in his Memorandum of Law in Support of the Motion to Vacate pursuant to C.P.L. § 440.10, Petitioner's claim– that defense counsel was ineffective for failing to introduce "the Medical Report" which Petitioner argued constituted "*Brady* Material" –was not adequate to put the state court on notice of the *prosecutor's* alleged violation of Petitioner's *Brady* rights. *See e.g., Lurie v. Wittner*, 228 F.3d 113, 124 (2d Cir. 2000) (explaining federal courts must "not consider a constitutional challenge that has not been 'fairly presented' to the state courts" nor should they "deem a petition to be in compliance with § 2254's requirements—in particular, that state courts be given the first opportunity to evaluate federal claims—unless 'the nature or presentation of the claim' in the state forum was 'likely to alert the court to the claim's federal nature[.]'")

Petitioner's *Brady* claim involves matters outside of the record; therefore, Petitioner could raise it in a motion to vacate pursuant to C.P.L. § 440.10.  *See e.g.*, *Mosley v. Rich*, No. 9:18-CV-0428 (JKS), 2020 WL 3128530, at *12 (N.D.N.Y. June 12, 2020) (explaining if a Petitioner's unexhausted claims "are based on evidence outside the record, however, they could still be brought in a motion to vacate judgment under CPL § 440.10 because there is no time limit or number cap on § 440.10 motions" but declining to stay Petitioner's § 2254 petition because Petitioner's "unexhausted claims [we]re plainly meritless.").

However, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  28 U.S.C. §2254(b)(2).  This is particularly true where the claim is plainly meritless.  *See Rhines v. Weber*, 544 U.S. 269, 277 (2005).  Accordingly, the undersigned turns to the merits of Petitioner's *Brady* claim.

In *Brady v. Maryland*, the Supreme Court held "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).[17] "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently;

---

(quoting *Daye v. Attorney Gen.*, 696 F.2d 186, 192 (2d Cir. 1982)) (additional quotations and citations omitted).

[17] To the extent Petitioner contends defense counsel violated *Brady* by failing to present evidence, he is mistaken. Counsel's alleged failure to present evidence in support of Petitioner's defense is properly addressed under *Strickland*, and is discussed above.

and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Petitioner has failed to satisfy any– let alone all –of these requirements.

"Evidence is favorable to the accused if it either tends to show the accused is not guilty or impeaches a prosecution witness." *Boyette v. Lefevre*, 246 F.3d 76, 90 (2d Cir. 2001) (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)); *see also Strickler*, 527 U.S. at 281-82 (explaining "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching[.]").  As explained above, Petitioner's contention that medical examination document is exculpatory is incorrect. Petitioner has also failed to offer any explanation as to how information concerning the victim's medical examination could have been used to impeach a prosecution witness. *See* Pet. at 7.  Therefore, Petitioner has failed to demonstrate the evidence at issue was "favorable" to his case.

Turning to the issue of "suppression," it is well established that "[t]he rule of *Brady* . . . applies in . . .  situations . . . involv[ing] . . . information which had been *known to the prosecution* but *unknown to the defense*."  *United States v. Agurs*, 427 U.S. 97, 103 (1976) (emphasis added).  Because "the prosecutor's duty to disclose necessarily extends only to 'information which had been known to the prosecution but unknown to the defense'" evidence cannot be deemed to have been suppressed "where the defendant either knew or should have known the essential facts permitting him to take advantage of the evidence in question[.]"  *United States v. Esposito*, 834 F.2d 272, 275 (2d Cir. 1987) (quoting *Agurs*, 427 U.S. at 103 and citing *United States v. Gaggi*, 811 F.2d 47, 59 (2d Cir.), *cert. denied*, 482 U.S. 929 (1987); *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982), *cert. denied*, 459 U.S. 1174 (1983)) (additional citations

omitted).  In other words, "*Brady* cannot be violated if the defendant[] had actual knowledge of the relevant information[.]"  *United States v. Zagari*, 111 F.3d 307, 320 (2d Cir. 1997).

In the instant matter, the record contradicts any suggestion that Petitioner lacked knowledge of the information at issue.  In the Affidavit submitted in support of Petitioner's Motion to Vacate his conviction pursuant to C.P.L. §440.10, Petitioner stated he "was aware of the Medical Examination . . . and requested that his wife consent to said examination shortly after the alleged allegations were asserted[.]"  SR 61.  Petitioner's knowledge of the victim's medical examination therefore belies any claim that the prosecutor withheld such information from Petitioner.  *See e.g., United States v. Torres*, 129 F.3d 710, 717 (2d Cir. 1997) ("It is well settled that evidence 'is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or should have known of the essential facts permitting him to take advantage of that evidence.'") (quoting *United States v. Gonzalez,* 110 F.3d 936, 944 (2d Cir. 1997)); *United States v. Zackson*, 6 F.3d 911, 919 (2d Cir. 1993) (concluding the government did not suppress information in violation of *Brady* where the defendant "had sufficient access to the essential facts enabling him to take advantage of any exculpatory material that may have been available[.]").[18]

Finally, "constitutional error results from [the] suppression [of evidence] by the government, [only] 'if there is a reasonable probability that, had the evidence been

---

[18] Similarly, Petitioner has not alleged, let alone proven, that the information at issue was *known by the prosecution.* In his Traverse, Petitioner claims "the fact that the prosecution never presented any results of any physical examination of Ms. Santana to the jury is, in and of itself, both highly suspect and high[l]y questionable." Traverse at 5. However, Petitioner has failed to provide any indication supporting the conclusion that the prosecution knew the victim underwent medical evaluation.

disclosed to the defense, the result of the proceeding would have been different.'"

*Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quoting *Bagley*, 473 U.S. at 682).  As

explained above in connection with Petitioner's ineffective assistance claim, Petitioner

has failed to demonstrate that the result of his jury trial would have been different if the

victim's medical examination results had been presented.  Therefore, even assuming

*arguendo* the prosecutor had withheld the evidence at issue, Petitioner would be unable

to demonstrate "prejudice ensued" from the prosecutor's failure to furnish Petitioner with

a copy of the information obtained as a result of the victim's medical evaluation.

In sum, because Petitioner is unable to demonstrate the prosecutor "suppressed"

evidence which was "favorable" to his case and that "prejudice . . . ensued" as a result,

Petitioner's *Brady* claim is meritless.  *See Strickler*, 527 U.S. at 281-82.  Accordingly,

this claim should be dismissed regardless of Petitioner's failure to exhaust the claim in

state court.  *See* 28 U.S.C. §2254(b)(2).

## V.    CONCLUSION

**WHEREFORE**, it is

**RECOMMENDED** that the petition, Dkt. No. 1, be **DENIED and DISMISSED** in

its entirety; and it is further

**RECOMMENDED** that no Certificate of Appealability ("COA") shall issue

because petitioner has failed to make a substantial showing of the denial of a

constitutional right" as 28 U.S.C. § 2253(c)(2) requires; [19] and it is further

---

[19] *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *see Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007) (holding that if the court denies a habeas petition on procedural grounds, "the certificate of appealability must show that jurists of reason would find debatable two issues: (1) that the district court was correct in its procedural ruling, *and* (2) that the applicant has established a valid constitutional violation" (emphasis in original)).

**RECOMMENDED** that any further request for a Certificate of Appealability must be addressed to the Court of Appeals (Fed. R. App. P. 22(b)); and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Report-Recommendation and Order on Petitioner, along with copies of unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72 & 6(a).[20]


DATED: August 14, 2023

Miroslav Lovric
U.S. Magistrate Judge

---

[20] If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections.  FED. R. CIV. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  *Id.* § 6(a)(1)(C).